IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Daryl Wilson, | ) | C/A NO. 3:06-2015-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION and ORDER** |
| v. | ) | |
| | ) | |
| Parnell Evans and Lois Evans, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | | |
| Ken Maloney, | ) | C/A NO. 3:06-2016-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION and ORDER** |
| v. | ) | |
| | ) | |
| Parnell Evans and Lois Evans, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

These cases are before the court on Defendants' motions for summary judgment. For the reasons set forth below, the court **grants in part and denies in part** the motions for summary judgment.

**STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from

1

those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiffs, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986). If the defendant carries its burden of showing there is an absence of evidence to support a claim, then the plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the plaintiff. *Anderson*, 477 U.S. at 248. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of the plaintiff's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23. Moreover, a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251.

**FACTS**

The following facts are drawn from the complete records of these cases, including the pleadings, motions and memoranda, and exhibits. All inferences are drawn in Plaintiffs' favor.

Daryl Wilson (Wilson) and Ken Maloney (Maloney) decided to go into business together and open an automobile repair and service shop. Wilson and Maloney planned to perform collision repair (including painting) and mechanical work. They also planned to purchase and sell used vehicles. Wilson began searching for a suitable location near Pelion, South Carolina, where his step-children were in school. In March 2006, Wilson approached Parnell Evans ("Parnell"), who he did not previously know, about leasing a building which Wilson heard might be available for rent. The building, which previously had been used as an automobile service garage and had a car lift, was located on property owned by Lois Evans ("Lois"), Parnell's wife. There is some dispute in the record about who (Parnell or Lois) was the final decision maker on the rental of the building. However, even if Lois was the final decision maker on the rental, the evidence is clear that Parnell acted as her agent.[1]

---

[1]Both Parnell and Lois indicate that the property on which the building is located is owned by Lois; however, Lois testified in her deposition that "I had nothing to do with it [what went on in the building]. You know, that was my husband – when we built it, I told him that, you know, he

Wilson told Parnell about the type of work that he intended to do, and that he had a business partner. However, Wilson did not inform Parnell that Maloney, who is a citizen of England, is black.[2]

Another individual was leasing the building at the time Wilson approached Parnell.[3] However, the individual was incarcerated, and Parnell informed Wilson that he (Parnell) would evict that individual so that Wilson and Maloney could lease the building. Wilson and Parnell thereafter reached a verbal agreement about a lease of the building. The parties agreed that the term of the lease would be one year and that rental of the building would be $600 per month, beginning June 1, 2006. The parties intended to enter into a written lease agreement. This, however, did not occur.

Based on the parties' verbal agreement, Wilson and Maloney were to be responsible for their portion of the electricity bill. Prior to June 1, 2006, Wilson activated telephone service at the building with Parnell's knowledge and consent. Wilson also opened a business checking account and had invoices printed (both listing the Pelion address), and both Wilson and Maloney secured customers who were waiting to have repair work done at the site.

The parties' agreement required Wilson and Maloney to pay a security deposit equal to one month's rent prior to occupying the building. On May 31, 2006, Wilson and Maloney, traveling separately, met at the Evans' property to pay the security deposit and to obtain the building's keys, intending to occupy the building the next day. Wilson testified in his deposition that upon seeing Maloney, Parnell's "facial expression just totally change[d]." Depo. of Daryl Wilson at 64 (Dkt.

---

handles that. I – you know, I didn't mess with any of that." Depo. at 15.

[2]Maloney was born in England, spent several years in Jamaica, and thereafter legally emigrated to the United States with his family when he was a teenager.

[3]This lease agreement was verbal.

4

# 24-11 in C/A 3:06-2015-CMC, filed Aug. 28, 2007). Parnell accepted the security deposit, gave Maloney the keys to the building, and showed Wilson and Maloney around the property. Parnell told Wilson and Maloney that the lease, which they were supposed to sign on May 31, was not ready, but that they could "move in whenever [they] wanted." *Id*.

The next morning (the day on which Wilson and Maloney intended to move their business into the building), Parnell contacted Wilson and informed him that he and Maloney could not move into the building until his (Parnell's) lawyer had completed "lease papers" for them to sign. After not hearing back from Parnell for several hours, Wilson telephoned him. Parnell then told Wilson that he had been advised by a local magistrate that it would be illegal to evict the previous tenant, who was (as is noted above) incarcerated.[4] Parnell then told Wilson that the building was not, and would not be, available for rent.

Later that evening, Wilson, armed with a tape recorder and accompanied by his wife, returned to the Evans' property. Maloney did not accompany them. Wilson confronted Parnell about why he (Parnell) had changed his mind about leasing the building. The parties' conversation, recorded by Wilson on the tape recorder (which was visible to Parnell), quickly devolved into dialogue which included several pointed, direct, and repeated racial epithets by Parnell, directed at both Wilson and Maloney. Both Lois and Janeigh Marie Wilson, Wilson's wife, were present when Parnell made these remarks.

After leaving the Evans' property and reluctantly playing the tape for Maloney, Wilson and Maloney decided to contact a local television station, WIS-TV. WIS-TV then sent a reporter to the

---

[4]There is evidence in the record that an eviction notice had already been served on this individual's wife, who had already removed his belongings from the building.

5

Evans' property, who interviewed Parnell. When confronted with the evidence of his own words, Parnell admitted his use of the racial slurs. Parnell's explanation was that he was upset when he made the statements, but that the true reason he had decided not to rent the building to Wilson and Maloney was that Wilson "lied to me to start with." Compl. at ¶ 19.

These lawsuits followed. Plaintiffs each alleged three causes of action: racial discrimination in violation of 42 U.S.C. § 1981; breach of contract; and defamation. Except for the alleged defamatory remarks noted in the defamation causes of action, the suits are identical.

**42 U.S.C. § 1981**

Section 1981 establishes that "[a]ll persons . . . have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To prove a § 1981 claim, Plaintiffs[5] must establish both that Defendants intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest. *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006); *see also Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004); *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751-52 (5th Cir. 2001); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413-15 (7th Cir. 1996). "The underlying discriminatory intent need not be the sole or even the dominant factor behind the decision . . . . It is sufficient for it to be a motivating factor." *Williams v. State University of New York*, 635 F.Supp. 1243, 1250 (E.D.N.Y. 1986) (quotation marks omitted).

---

[5]Wilson has standing to assert a cause of action under § 1981. *See Yesteryear's, Inc. v. Waldorf Restaurant, Inc.*, 730 F.Supp. 1341, 1351-52 (D. Md. 1989) (gathering cases).

6

A claim imposing personal liability under § 1981 requires personal involvement on an individual's part. *Allen v. Denver Public School Bd.*, 928 F.2d 978, 983 (10th Cir. 1991). "[P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Figures v. Board of Public Utilities of Kansas City, Kan.*, 731 F.Supp. 1479, 1483 (D.Kan. 1990).

Courts apply the burden of proof which applies in an employment discrimination case to those claims brought under § 1981. *Monroe v. Burlington Indus., Inc.*, 784 F.2d 568 (4th Cir. 1986). Therefore, a plaintiff may offer proof of discrimination via direct evidence or, if direct evidence is unavailable, by using the "burden-shifting" method of proof found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

During the confrontation between Wilson and Parnell, Wilson questioned Parnell about his decision to not lease the building to him and Maloney after Parnell met Maloney:

Wilson: "When [Maloney] showed up, it seemed like – seemed like something was up.

Parnell: Well, that had something to do with it.

Wilson: What, Ken being black?

Parnell: Right.  I –

Wilson: Why?

Parnell: – because I don't – I don't want them – These people that live out here don't want them out here to start with.

Wilson: Well, you know, I –

Parnell: I didn't know nothing about it until you – till he said – tell you – till he walked up that he was black.

Wilson: Well, that's discrimination, Mr. – come on –

7

>Parnell: Well, I don't care. I don't care. I'm not – I don't – I'm not prejudice or nothing like that to amount to anything. I've got one that comes to my house and works on my computer.

# # # #

>Wilson: [speaking to Lois]: [H]e said right out there at that garage in front of my wife and on this recorder that, yes, it was partially because [Maloney] was black that he wasn't going to rent that building to –

>Lois Evans: I've got –

>Wilson: – us.

>Lois Evans: – no. I've got no –

>Parnell Evans: This is her – . . . land, see.

>Lois Evans: I've got nothing against blacks.

>Parnell Evans: This is – all this is hers. It ain't mine.

>Lois Evans: Nothing.

>Wilson: But you said it.

>Parnell Evans: I ain't titled to it.

>Wilson: You said it.

>Parnell Evans: Yeah. I don't like a damn nigger. You understand that? You want me to tell you again that I don't like a God-damn nigger?

>Lois Evans: Hush.

>Parnell Evans: And I don't like nobody that messes with a damn nigger. There's a difference in a nigger and a black.

Ex. B to Defs. Memo. in Supp. (Dkt. # 24-4 in C/A 3:06-2015-CMC, filed Aug. 28, 2007).

Plaintiffs have presented direct evidence of Parnell's intent to discriminate, and that this discrimination likely interfered with a contractual interest. *See Jones v. City of Boston*, 738 F. Supp.

604, 607 (D. Mass. 1990) ("Without question, the racial epithet of 'nigger' shows an intent to discriminate on the basis of race.")  Therefore, it is unnecessary to apply the *McDonnell Douglas* burden-shifting analysis to determine whether Plaintiffs have proffered sufficient evidence to overcome Defendants' motion for summary judgment as to Parnell.

As to Lois, Plaintiffs have presented some evidence of her acquiescence in Parnell's act of discrimination.  During the confrontation between Parnell and Wilson, Lois attempted to distance herself from Parnell's remarks by stating that she has "nothing against blacks."  However, her self-serving statement was made after Parnell had indicated that at least one of the reasons he had changed his mind about leasing the building was because Maloney was black.  Moreover, Lois did nothing to veto Parnell's decision not to lease to Wilson and Maloney despite her ownership of the building.

"Where a principal clothes its agent with apparent authority to act in a certain capacity, it is bound by all of the acts of such agent within the scope of such authority."  *Moore v. Pilot Life Ins. Co.*, 32 S.E.2d 757, 762 (S.C. 1945).  A principal may expressly or impliedly ratify the illegal acts of an agent.  *Southern Bell Tel. & Tele. Co. v. WRNO, Inc.*, 59 S.E.2d 146 (S.C. 1950).  In South Carolina,

> Ratification . . . means the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another who at the time assumed to act as his agent.

*Lincoln v. Aetna Cas. & Surety Co.*, 386 S.E.2d 801, 803 (S.C. Ct. App. 1989). Ratification requires three elements:  (1) acceptance by the principal of the benefits of the agent's acts; (2) full knowledge of the facts; and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangements.  *Id.*    There is sufficient evidence to deny Defendants' summary

judgment motions as to Lois on Plaintiffs' claims against Lois for a violation of § 1981.

Defendants' motions for summary judgment as to Plaintiffs' § 1981 claims are **denied**.

### BREACH OF CONTRACT

Plaintiffs allege that Defendants' actions constituted a breach of contract. "The necessary elements of a contract are an offer, acceptance, and valuable consideration." *Sauner v. Public Service Authority of South Carolina*, 581 S.E.2d 161, 166 (S.C. 2003). The exchange of the security deposit and the keys to the building were simply manifestations of the parties' verbal contract. It is irrelevant that the parties had not yet signed a written lease, particularly as Parnell told Wilson and Maloney that they could occupy the building whenever they wanted after they paid the security deposit.

Defendants argue in their opposition to Plaintiffs' § 1981 claims that Lois was the ultimate decision maker on the rental of the building to Wilson and Maloney, and therefore Parnell's actions, if shown to constitute a breach of contract, are not attributable to Lois. However, a variety of evidence exists that Lois had given Parnell authority, either apparent or actual, to lease the building.

For the reasons noted above relating to agency and ratification, Defendants' motions for summary judgment as to the breach of contract claims are **denied**.

### DEFAMATION

As noted in *Williams v. Lancaster County School District*, 631 S.E.2d 286 (S.C. Ct. App. 2006),

> [t]he tort of defamation allows a complaining party to recover for injury to his reputation as the result of a false communication to others about him, made by the defendant. Slander is a spoken defamation, while libel is a written defamation or one accomplished through actions or conduct. In order to prove defamation, a party must show: (1) a false and defamatory statement was made; (2) the unprivileged publication of the statement to a third party; (3) the publisher was at fault; and (4)

10

>either the statement was actionable irrespective of harm or the publication of the statement caused special harm.

*Williams*, 631 S.E.2d at 292. The alleged defamation in this case took the form of slander.

A statement is defamatory if it tends "to impeach the honesty or integrity or reputation, or publish the natural or alleged defects, of one who is alive, and thereby to expose him to public hatred, contempt, ridicule, or obloquy, or to cause him to be shunned or avoided, or to injure him in his office, business, or occupation." *Scott v. McCain*, 250 S.E.2d 118, 120 (S.C. 1978) (quotations omitted). "Though falsity is an element of defamation and although truth is a complete defense, a defamatory statement is presumed to be false under common law." F. Patrick Hubbard & Robert L. Felix, The South Carolina Law of Torts 485 (3d ed. 2004). The court makes an initial determination whether the statement is susceptible of having a defamatory meaning. *White v. Wilkerson*, 493 S.E.2d 345, 347 (S.C. 1997). "[T]he law in South Carolina allows the context of the words themselves and the circumstances under which the words are spoken to be considered in determining whether there is a defamatory meaning and whether it is actionable . . . ." *Goodwin v. Kennedy*, 552 S.E.2d 319, 324 n.4 (S.C. Ct. App. 2001).

A defamatory statement may either defamatory *per se* or defamatory *per quod*. "A statement is defamatory *per se*, or on its face, if its defamatory meaning is apparent from the language itself. It must be susceptible of only one meaning, that being a defamatory one. If an innocent construction can fairly be made of the statement, it cannot be defamatory *per se*. Conversely, if it is necessary to refer to facts or circumstances beyond the language itself in order to make the defamatory meaning of the statement clear, it is defamatory *per quod*." *Id.* at 348 n.1.

In addition to being defamatory, a defamatory statement must also be actionable. Slander is actionable per se "when the defendant's alleged defamatory statements charge the plaintiff with

11

one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession." *Id*. at 322-23.  "In a defamation action that is actionable *per se*, general damages are presumed and need not be proven by the plaintiff."  *Id*. at 323.[6]  A slanderous statement is not actionable *per se* if its meaning does not fall into one of the five categories above.  For a plaintiff to recover if a defamatory statement is not actionable *per se*, the plaintiff must prove special damages and actual malice. *Capps v. Watts*, 246 S.E2d 606, 611 n.2 (S.C. 1978).[7]  Truth of the alleged defamatory statement is an affirmative defense.  *Parker v. Evening Post Publishing Co.*, 452 S.E.2d 640, 646 (S.C. Ct. App. 1994).

### *Defamation – Wilson*

Wilson contends that Parnell published an allegedly defamatory statement by telling the WIS-TV reporter that he did not rent the building to Wilson because "[Wilson] lied to me to start with."  The court finds that this statement is susceptible of having a defamatory meaning.  Whether this statement was defamatory is a question for the jury.  *Goodwin*, 552 S.E.2d at 323.  However, Wilson concedes, as does Maloney, that he has no evidence that Lois defamed him in any way.

### *Defamation – Maloney*

Maloney asserts that Parnell slandered him when he launched into the above-quoted tirade.

---

[6] The South Carolina Supreme Court has indicated that it "strongly discourage[s] use of the term actionable *per quod* and instead suggest[s] the issue be posed as 'actionable *per se*' or "not actionable *per se*.'" *Holtzscheiter v. Thomson Newspapers, Inc.*, 506 S.E.2d 497, 510 n.2 (S.C. 1998).

[7] Special damages "are tangible losses or injury to the plaintiff's property, business, occupation or profession, capable of being assessed monetarily, which result from injury to the plaintiff's reputation." *Holtzscheiter*, 506 S.E.2d at 510 n.4.

The court finds that Parnell's statements, viewed in the context of the entire confrontation, are susceptible of having a defamatory meaning. Parnell's statements, including the assertion that there exists some "difference in a nigger and a black," could reasonably be construed as implying some unfitness of Maloney for his profession. Parnell's diatribe was not, however, slanderous *per se*. *Bradshaw v. Swagerty*, 563 P.2d 511, 514 (Kan. App. 1977) ("The term 'nigger' is one of insult, abuse and belittlement harking back to slavery days. Its use is resented and rightly so. It nevertheless is not within any category recognized as slanderous *per se*."); *Irving v. J.L. Marsh, Inc.*, 360 N.E.2d 983, 985 (Ill. App. 1977) (same for the term "arrogant nigger"). *Cf. Garraway v. Diversified Material Handlings, Inc.*, 975 F. Supp. 1026, 1034 (N.D. Ohio 1997) ("The vulgar phraseology selected by [Parnell] reflects more on his own character than that of Plaintiff."). Whether Parnell's statements are actionable is a question for a jury.

Defendants' motions for summary judgment as to Plaintiffs' defamation claims are **granted** as to Lois and **denied** as to Parnell.

### CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part as outlined above. This matter shall proceed to trial before a jury during this court's February 2008 term of court.

**IT IS SO ORDERED.**

<u>s/ Cameron McGowan Currie</u>
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
December 4, 2007

13